Bravo v. Midland Credit Management, which is not a sentencing guidelines case. Mr. Phelps. May it please the court, I'm in counsel. I'm David Phillips. I'm here on behalf of Plaintiff Appelant, Ms. Bravo. You were not confused by these letters, were you? Absolutely not. I knew that they were illegally collecting the debt. And that's the point. It's not a question of my client being deceived or misled or me being deceived or misled. It's that they kept collecting a debt they shouldn't have been collecting. You know, when I lecture on the Fair Debt Act on various topics to consumers, you can almost guarantee what the appellate court outcome is just by the start. Usually the bad start is so-and-so racked up a huge debt, didn't pay it, and then launched this federal court lawsuit. Well, here the facts get in the way of that. Ms. Bravo was paying her debts through legal aid attorneys. They had a deal in place. They ignored the legal aid attorneys and tried to collect directly from her. That's what started the first Bravo lawsuit. And that first Bravo lawsuit was brought in conjunction with another consumer, Ms. Covarrubias. I don't have any easy names today. I've got Katushka Bravo and Covarrubias. I'll do my best. Ms. Covarrubias had also worked out a deal through legal aid and was paying her debts. And they ignored that and tried to collect directly from her. You know, the district court's analysis on this was infected by a misperception on what was going on here. As the defendants aptly noted in footnote 4 on page 20 of their brief, at one of the status hearings, the district court judge said, well, this is like two neighbors and one neighbor blew the leaves on the other neighbor's lawn. And instead of saying, hey, knock it off, they launched a lawsuit. Well, I would say that no consumer I've ever represented thought that a debt collector was their neighbor. You know, that would be like saying deers and wolves are neighbors because they're in the same ecosystem. They are not. Let me ask you this. You settled the case, correct? Correct. And so when you settled the case, the case was over with and your representation of Ms. Bravo was over with, correct? I wouldn't agree with that, Judge. I'd say I represented her as to those debts. Well, but if the settlement was, well, if you were still, well, the letter came to you addressed to her, correct? Correct. Did you open the letter? Yes. You didn't give it to her to open? No, we called her about it. Well, why did, did you call her after you opened the letter? Right. Now, why did you open a letter addressed to somebody else? Because it was at my address. And we get mail for consumers at our address and we open it and decide what we need to do. Do we need to send it on to them? Do we need to do a response? Because sometimes it's communication. Wasn't that a communication with the attorney then and not directly to the consumer? Well, no. Communication to the agent is communication to the principal. And more importantly, Judge, in answer to your question, under the settlement, the terms aren't in front of you, okay? The settlement agreement had me continue to represent her. It also had defense counsel continue to represent Midland. If the case had continued beyond just the motion to dismiss, that settlement agreement would have been put in the record. And how can you distinguish Tinsley then? Well, I can distinguish Tinsley ably because Tinsley, the debt was still owed. And it was a phone call to the consumer's attorney saying, hey, let's get this resolved, okay? Here the debt was not owed at all. There was nothing to resolve. And Judge Easterbrook, in writing the panel opinion in Tinsley, specifically noted that there was a concern there that you would cut off pre-litigation negotiations. You would just force the debt collector to go ahead and sue the consumer. Here that wasn't involved at all. The debt was over with. And let's look at the actual letter itself because it wasn't just pay me, pay me, pay me. I mean, although they did use the term payment, I don't know, I lost count after 11 times. And they said there was a balance due. But the more important thing was that it also threatened a credit report, okay? It threatened to take an action it couldn't legally take in the future. The letter itself, which is an exhibit to the complaint and also set forth in district court opinion, said this account may still be reported on your credit report as unpaid. That is absolutely incorrect and was a threat against Ms. Bravo that had to be responded to. And that's the issue here, not one of being deceived or misled. The issue is the debt collector's actions here made someone have to do something because it was a material statement that she owes the debt and they made credit report it if something bad is going to happen. Just because a consumer knows that, let's say, for example, that a debt collector has filed a time-barred lawsuit against them, just because the consumer knows they can defeat that lawsuit doesn't mean the act hasn't been violated. Phillips v. Asset Acceptance by this court found that filing time-barred lawsuits is a violation, regardless of whether you're misled or deceived. So that's really the red herring here. The district court also, I think, was confounded by what was the motive here. What was the motive here? The court specifically said that not often would someone send a collection letter to lawyers with whom they've just concluded settlement negotiations in the hope of tricking the lawyer's clients. That's not it at all. This wasn't Mr. MCM negotiating with Ms. Bravo with two attorneys involved. This is Midland Credit Management, one of the biggest debt collection companies in the nation. It's a publicly traded company, or part of it, the parent company is publicly traded. In the last five years, they've bought over $128 billion worth of debt for about three cents on the dollar. That's in the CFPB consent decree that we cited you to. So they're not flipping one burger there on the grill. They're flipping millions at a time, millions at a time. And probably what happened here, but we never got to it because it's just at the motion-dismiss stage, is either outside defense counsel didn't bother to communicate with in-house counsel, which is how it works at Midland, or in-house counsel didn't communicate with the business people, the operations people that are doing the collections, or the operations people just screwed up and didn't bother to stop the account. Anywhere along that. We're not saying that there was some deliberate conspiracy here to try to trick anybody. It's not the issue. And it's also not the issue that we flew off the handle and filed a lawsuit. We sent three emails. Those are in the record. We also had phone calls saying, what's going on here? You know, a simple response of, oops, sorry, we're closing it down, we didn't do that. We got no response. So I have to rile up my client, say, we got these letters. Have you been getting any other letters? Have you been getting any phone calls? We need you to pull your credit report to make sure there's not a negative credit report. How many letters were there total? Two letters. How many phone calls? Well, it turned out they hadn't made any phone calls. And it turned out they hadn't made a negative credit report, but we didn't know that when we got the letters, and we certainly didn't know that in the month period when we were trying to find out, what are you doing and why are you doing it? We got no response. We got deafening silence, one of my favorite oxymorons. A simple call back would have done something. And unfortunately, this happens all the time. It happens all the time. If you read the CFPB consent decree, they routinely send out for collection debts that are disputed by consumers. It's one of the things they're barred from doing now. They send them out, and their stock in trade is they send collection letters, and then they file lawsuits. They file more lawsuits than any consumer in the world ever thought to do. The fact is that, you know, about ten times a year I wind up suing the MCM and Midland Funding over the exact same conduct, where they ignore consumer representation by attorneys, where they ignore that someone's on a payment plan. So it's not unusual. It's just they're too big and don't have the necessary compliance to do what they should be doing. And it's your contention that the threat contained in these letters is the statement warning that the account may be reported to the credit report as unpaid. That is one of the threats. The other one is that she still owes money and they can collect it from her. But both of those are in there, Judge. If there's any other questions, I'll reserve the rest of my time. Thank you, counsel. Thank you, Judge. Thank you, Bertocchi. Good morning, Your Honor. Joel Bertocchi on behalf of the defendants. Let me first address the threat theory. This is a new theory. It's not in the pleadings. It was not argued to Judge Feinerman. He didn't rule on it. No threat theory was argued in the briefs in this case, and so as we pointed out in our brief, that was waived. And it wasn't brought up in the reply brief either. Judge Feinerman does go on for some pages about the distinction between a threat to take action. Yes. Oh, no, I understand. I'm talking about the threat of the credit report reporting. The threat that was alleged in the complaint and that Judge Feinerman alleged was the threat to try to continue to collect on a debt that wasn't owed. I see. That's the distinction I'm making. Now, there is no threat argued in the briefs in this court, either in the opening or the reply brief. So that's a new theory. Mr. Phillips says he wasn't confused. He says he wasn't deceived or misled, and if he were not deceived or misled, neither would a competent lawyer in his position. And by that, I don't mean to suggest that Mr. Phillips is not a competent lawyer. I'm just talking about the hypothetical objective competent lawyer. The prior lawsuits in this case are not at issue. Whatever happened to Ms. Bravo with Midland before that was dealt with in the settlement, and that's all over. This lawsuit is about these two letters. Mr. Phillips agrees that he still represented Ms. Bravo. He opened the letters. He properly opened the letters. He should have. Any lawyer would have. In his brief, he argues that it's a different situation because her name is on there. It's addressed to him, care of her. But as Mr. Phillips admits, in that situation, a lawyer is going to assume that a letter sent to his business is about his business with his client, is going to open it. The policy that animates 1692C and also animates 1692E cases where there's a lawyer involved is not to leave the client in a situation where she doesn't have the protection of the lawyer when she's contacted. And, of course, that did not happen here. By sending it to Mr. Phillips, the letter, he opened it, and Ms. Bravo never had to hear about the letter without having her lawyer right there explaining to her what its ramifications were, that, in fact, the debt wasn't owed, as he well knew, because he had settled the case. Now, Mr. Phillips says that the Tinsley decision should be limited to its facts, which was ongoing litigation, and this is not ongoing litigation. There's nothing in the statute that would suggest that, and there's nothing in Tinsley that would suggest that. What Tinsley talks about, it's a statutory construction case that talks about what the word consumer means and how in the context of the Act and of that section, it doesn't mean lawyer. It means consumer. And the holding in Tinsley was that a debt collector can communicate freely with the lawyer for the debtor as opposed to the debtor themselves. Indeed, must communicate. And has to, in fact. In fact, Mr. Phillips makes that point. He says the agent and the principal are the same thing, and he's right, but he draws the wrong conclusion from that, because the conclusion he would draw from that, which is that any communication with a lawyer about a client has to be treated as if it went straight to the client. That's exactly what was rejected in Tinsley, because if that were true, hiring a lawyer would mean there couldn't be any communication at all. Do you read Tinsley as essentially immunizing any communications with a consumer's lawyer? Not immunizing them, but they still have to be analyzed under every. But under 1692C, yes. I think Tinsley says that 1692C does not apply to communications with lawyers. That doesn't mean they're immunized, and here the court has before it a 1692E claim where you can plead a claim about deceptiveness in a communication with a lawyer. But in this case, for the reasons we've argued in our brief, it doesn't qualify. Because at best we're in the generic false or fraudulent activity? Yes. The specific threat claim is out, and so we're talking about deceptiveness, and if there's anything made clear here, it's that no one was deceived about this. And when Ms. Bravo heard about it, she heard about it from her lawyer, who could assure her that there was no validity to it, and I don't know what Mr. Phillips said to her, obviously, but my guess is he told her it was a screw-up of some sort, which is what he told us today. The district court did not consider Midland's motive, as Mr. Phillips suggests. If you look at Judge Feinerman's very careful analysis, there's nothing in there that talks about motive or why Midland sent the letter, or any of those issues that would have come up in a bona fide error defense if the case had gotten beyond the pleadings. That doesn't mean that when Judge Feinerman did talk about this passage that Mr. Phillips quoted about, well, no one sends letters to try to trick somebody. The point of that is not what Midland's motive was. The point is, what would a competent lawyer think when they got that about motive? And so in that sense, he was sticking to the deceptiveness analysis, which didn't require any consideration of why Midland did what it did. Your Honor, if there are no further questions, I'll stand on my brief for the remainder. Thank you. How much time? We'll give you a minute to respond. Thank you, Judge. I appreciate that. The idea that the credit reporting issue is new and waived is just not true. Both of our briefs mentioned that that was one of the issues that we were concerned about, credit reporting. In fact, in our opening brief, page 15, we mentioned credit reporting. Throughout the reply brief, we mentioned credit reporting. Secondly, it's not an issue of deception or knowing that they can't do it. It's that someone has to do something to stop them. Just recently in Lee v. Nationwide Credit, this court said it didn't matter that the consumer who disputed the debt knew they didn't owe the debt. It was that they kept collecting the debt. In Locks v. CDA, this court found that where a consumer knew they didn't owe attorney's fees on the letter, the threat to impose them was a violation because someone would have to do something to stop that. It's the same in Randolph v. IMBS. Somebody who's bankrupt and they keep collecting debt, they know that the debt's not owed, but someone has to do something to stop it. That's the issue here. Thank you. Thank you, counsel. Thanks to both counsel. The case will be taken under advisement, and the court will be in recess.